ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Lean Construction and Engineering Co. ) ASBCA No. 58995
)
Under Contract No. W56SGK-13-C-7075 )

APPEARANCE FOR THE APPELLANT: Mr. Abdul Ghafar Rassin
Executive Director

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ John R. Longley, JA
LTC Brian J. Chapuran, JA
MAJ Michael G. Pond, JA
Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE PAUL

This is a timely appeal of a contracting officer's (CO's) final decision denying appellant Lean Construction and Engineering Co.'s (Lean's) claim in a total amount of $54,041.00. The Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, is applicable. A hearing was held at the Board's offices.

FINDINGS OF FACT

1. On 28 March 2013, the U.S. Army, through its Camp Phoenix Regional Contracting Center in Afghanistan, issued Solicitation No. W56SGK-13-R-7054 to perform construction work at the CPNA Cargo Yard which was located on the grounds of the Kabul International Airport (R4, tab 2 at 1). The project encompassed the resurfacing of an old Russian road which extended from the airport's flight line to a storage yard–the CNPA Cargo Yard–and the repair of a gate bordering on the compound. The storage yard itself was used by counter-narcotics personnel to store narcotics found at the airport. (Tr. 82-83, 164-65)

2. Prior to award, potential offerors were provided the opportunity to examine the work site in detail. Although Lean's principal, Mr. Ghafar Rassin, was present, he performed no personal examination other than merely observing the road and the gate. (Tr. 41-42)

3. On 23 April 2013, the Army awarded Contract No. W56SGK-13-C-7075 to Lean to perform the requirements set forth in the solicitation which had been issued during the prior month. Contract line item number (CLIN) 0001 of the contract stated, in part:

> The contractor shall provide all tools, labor, security, equipment, materials, transportation to perform all requirements in accordance with the attached specifications referenced in Section J and the Statement of Work (Attachment 1)[.]

The fixed price for performance of CLIN 0001 was $127,278.00. (R4, tab 1 at 1, 3)[1]

4. Pursuant to Federal Acquisition Regulation (FAR) 52.211-10, COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984), the contract provided:

> The Contractor shall be required to (a) commence work under this contract within ten (10) calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than ninety (90) Days[.] The time stated for completion shall include final cleanup of the premises.

(R4, tab 1 at 7)

5. The contract incorporated by reference several other, pertinent FAR clauses, including FAR 52.233-1, DISPUTES (JUL 2002); FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); and FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 1 at 6, 32).

6. With respect to invoices, the contractual provisions were very specific. They stated:

> INVOICE INSTRUCTIONS
>
> INVOICE INSTRUCTIONS–EXTREMLY [sic] IMPORTANT
>
> *To ensure prompt payment, be sure to follow these instructions*

---

[1] The contract also contained CLIN 0002 through which the Army was to pay Lean a "DBA insurance premium" in the estimated amount of $541 (R4, tab 1 at 4). CLIN 0002 is not pertinent to this appeal.

Contractors: Please send your invoices to the Contracting Officer's Representative with a copy to the Contracting Officer (OR his/her replacement) that awarded your contract. Once services are delivered, inspected and accepted, the Contracting Officer's Representative will fill out a DD Form 250 (Receiving Report) and send it to the Contracting Office.

In order to ensure a proper invoice, an invoice must include,

1. Invoice date
2. Name of Contractor
3. Contract Number, line item number (CLIN), description of project, quantity, unit of measure, unit price and extended total. (It MUST match the contract EXACTLY)
4. Requisition number or document number
5. Date of acceptance
6. Phone number and email address of the person to be notified in the event of a defective invoice
7. Discount terms

**The company name on the Executed Award, the name on the invoice, the name in www.jccs.gov, the name in http://afghanistan.buildingmarkets.org and the name on the bank account provided on the EFT Form ALL MUST MATCH EXACTLY to get paid**

Note: Ensure you have submitted your DBA paid receipt along with your first invoice. No invoices will be processed until proof of payment has been received.

(R4, tab 1 at 9) Regarding these requirements, Mr. Mark Penwell, the CO, testified:

I have been in Afghanistan almost two years and I've seen many falsified invoices and fraudulent documents. And for the prudent Contracting Officer, it's wise to verify invoices here in Afghanistan.

(Tr. 87)

3

7. The contract contained a drawing entitled "CNPA Pavement Detail," which portrayed the various layers of soil subgrade, compacted aggregate base, asphalt base course, and asphalt surface course to be laid by the contractor. Starting at the bottom of the drawing, Lean was to compact a soil subgrade to a standard proctor of 98%. As explained by Mr. John K. Moody, an Army quality assurance specialist who is a "licensed architect by trade and a construction specialist":

> A proctor is a determination -- a laboratory determination of the soil's capacity to compact or densify [sic]. You take soil samples then in a laboratory, you would determine the optimal moisture content to receive the maximum density. Then you would compare everything thereafter to that laboratory sample. And the percentage is achieved as an acceptable range relative to that sample.
>
> So if you can get 98 percent of what was determined in the laboratory to be optimal, then it's acceptable.

(R4, tab 1 at 49; tr. 128, 133) The next level above the soil subgrade was described as "250 mm COMPACTED AGGREGATE BASE COMPACTED TO 95% STANDARD PROCTOR." Mr. Moody described this as "engineered soil" that would be transported to the job site from an outside stockpile or gravel pit. (R4, tab 1 at 49; tr. 133-34) The next layer was a "100 mm ASPHALT BASE COURSE"; and the final layer was a "50 mm ASPHALT SURFACE COURSE" (R4, tab 1 at 49).

8. Paragraph 6 of the contract's general requirements provided:

> Quality of Work: All work shall be conducted in a professional manner, in accordance with accepted methods of construction, as detailed in the attached specifications. U.S. and Afghan Government personnel on site shall make regular inspection of work as it progresses. When work is completed at each stage of the project, Contractor shall submit work for inspection and be signed off by U.S. or Afghan Government personnel on site.

(R4, tab 1 at 51)

4

9. On 1 May 2013, the CO forwarded a notice to proceed (NTP) to Lean which stated, in pertinent part:

> 1. This correspondence is your official **Notice to Proceed** with the work as called for under the terms and conditions of Contract No. W56SGK-13-C-7075. As set forth in the contract, you are required to commence work within **10 calendar days** after the effective date of this NTP. You must complete all requirements of this project within **90 calendar days** of the effective date of this Notice to Proceed, but no later than **09 August 2013**.
>
> 2. The effective date of this Notice to Proceed is: **02 MAY 2013**.
>
> 3. **The Contracting Officer's Representative (COR) and/or the FOB Commander CANNOT change this contract or direct you to do work that is not in this contract. All changes made must be in writing by a contract modification and you will be asked to sign the change to the contract to let you know it is an official change. You will NOT be paid for work done outside of the contract terms, conditions and specification. If someone asks you to do something different than what is in the Statement of Work, contact the Contracting Officer immediately.**
>
> 4. You are highly encouraged to contact the project's Contracting Officer's Representative (COR), **Mr. Dan Dergance at** [his email address] to schedule your work start date and to gain access to the construction site. Although the COR cannot make changes to the contract, he can help with any specific questions you may have with this project. If you have questions about the contract, please contact the Contracting Officer immediately.
>
> 5. Please sign, date, and return to the Contracting Officer as evidence of receipt.

(R4, tab 7)[2]

10. Almost immediately after NTP, problems developed between Lean and the Army's COR, SFC Nicholson regarding the contract's requirements.

---

[2] Mr. Dergance was subsequently replaced as COR by SFC David Nicholson (tr. 164).

Specifically, SFC Nicholson testified that, prior to 15 May 2013, there had been discussions with Mr. Rassin concerning the statement of work (SOW). He testified further:

> Well, his interpretation of the SOW was different from our interpretation of the SOW. So we were constantly trying to explain to him in English and in Dari what we were trying to get done and he needed to do to satisfy the SOW, the Statement of Work.
>
> And it went from drainage to crowning the roads at pretty much everything, binding, product—pretty much, we tried to advise him on everything.

(Tr. 173-74) As part of these discussions on 15 May 2013, SFC Nicholson forwarded an email to Mr. Rassin to which he attached a copy of the CNPA Pavement drawing, as well as "another copy of Task Force Phoenix'[s] Standards for you to read." He stated further: "I would take a look at Section 2.0 on General Excavations." (R4, tab 43 at 2)

11. On 17 May 2013, Mr. Rassin forwarded an email to SFC Nicholson in which he stated that Lean had encountered "a soft mud" condition while excavating the road. Somewhat cryptically, Mr. Rassin also stated:

> Regarding the issue of soft mud underneath, last three days I was waiting to have answer from you (either we should follow the SOW and Drawing which is 250mm or to dig more) but finally today I had to dig it more with high cost. Because we were told to finish it for Saturday.

(R4, tab 36 at 10-11)

12. As part of his testimony at the hearing, Mr. Rassin gave conflicting accounts regarding when he first notified the Army of the "soft mud" issue. For example, he testified variously that he alerted the COR of the problem by telephone two days before his email of 17 May 2013 (tr. 60-62), one day before the email (tr. 45-47), and finally, the same day as the email (tr. 47).

13. In his email of 17 May 2013, Mr. Rassin also alluded to an instruction from and anonymous individual to finish the job by Saturday, 18 May 2013 (R4, tab 36 at 11). At the hearing, Mr. Rassin testified that this instruction came from Mr. Wazeri, the Director of the Afghan Custom Department. He also testified:

6

> Mr. Wazeri told me that–I remember Mr. Wazeri told me
> this road is blocked since yesterday and we cannot make
> any movement. And if you cannot solve this issue very
> soon, we will lose millions and millions. The government,
> Afghan government will lose millions and millions,
> because we cannot import or export cargoes from here.

(Tr. 12) In purportedly taking instruction from Mr. Wazeri, Lean contravened the instructions contained in paragraph 3 of the NTP (finding 9).

14. SFC Nicholson testified that, prior to Mr. Rassin's email of 17 May 2013, Lean had never informed him as COR of any direction by any Army or Afghani officials that the road project had to be completed by 18 May 2013 (tr. 167-70).

15. On 21 May 2013, SFC Nicholson was able to conduct a site visit of the job site; but by this time, the excavation had been completed. Thus, SFC Nicholson was never able to examine the "soft mud" at issue. (Tr. 172) However, on 22 May 2013, Mr. Rassin did offer to send the COR "a couple of photos that I took during the paving work," so that he could observe the site condition (R4, tab 36 at 10).

16. On 22 May 2013, Mr. Rassin forwarded the following email to the COR:

> Thank you for coming to the site yesterday. As I
> promised here please find a couple of photos that I took
> during the paving work.
>
> Regarding the issue of sub-base, we calculate the
> extra cost as below.
>
> [W]e have around 2000 m2 to pave, for this area to
> have 25cm sub-base we need 0.25 * 2000 = 500 m3. For
> each m3 we quoted 24 USD (see the bill of quantity, the
> total cost for sub-base was 500 * $24 = $12,000)
>
> But we dug 70cm, so 2000* (70 - 25) = 900 m3, so
> 900 meter cube is the extra sub-base we put.
>
> Hence: 900 * $24 = $ 21,600 (total extra cost)
>
> For your information, we do lots of extra work for
> free like paving the other side of flight entrance gate, in

7

front of custom entrance gate, installing curbstone, and making a drainage well.

(R4, tab 36 at 10) The photographs forwarded by Mr. Rassin are contained in the Rule 4 file at tab 40, pages 1 through 8.

17. At the hearing, Mr. Rassin relied heavily on these photographs in order to demonstrate that Lean had encountered a differing site condition. Specifically, Mr. Rassin stated that the photographs depicted "very soft mud," as well as water. (Tr. 58-59) However, Mr. Moody, the quality assurance specialist with "approximately 30 years of experience...in the construction industry" examined the same photographs and reached the opposite conclusion regarding soil conditions at the job site (tr. 128-29). Examining the photograph in which Mr. Rassin purported to see water, Mr. Moody testified:

> But if you look at that cross section, what I see, what kind of gives me the sense that we're dealing with pretty good material is on the kind of the lower left side of the photograph you see what appears to be kind of a scrape, a smooth scrape across the soil. And to me that indicates clay. That indicates a decent amount of clay in the soil because it's slick and smooth which is a characteristic of what you find when you do that to clay. I've seen this many times.

As for the second photograph where Mr. Rassin purported to see "soft mud," Mr. Moody testified:

> So I don't see any of the side wall falling off. I don't see any distress in the layers of that tan layer. I don't see– if it were really unsuitable soil with a lot of organics and moisture, it would tend to be very dark. What you want to do is see tan and yellow clays in deep soils like that and that's kind of what I'm seeing.

(Tr. 142-43) Regarding the other photographs, Mr. Moody did not "see anything" that "was additionally soft or wet or somehow contaminated or unsuitable with organics such that a road could not be built on it" (tr. 145; R4, tab 40, *passim*).

18. On 8 June 2013, the CO issued a suspension of work order pursuant to FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 10 at 3). Several days later, Lean informed the COR that the job site was "ready for handover" on 3 June 2013 (R4, tab 11). On 9 June 2013, the CO informed Lean that there was a "question about the

8

quality of the asphalt. We are going to test the asphalt prior to accepting." (R4, tab 10 at 1) SFC Nicholson explained the government's concerns as follows:

> The top coat was tearing. There was pooling of the tar material on the top coat. We never saw that aggregate put down. We never saw the base course put down and we've never saw the top course put down.
>
> So I was trying to verify anything I could...to confirm that he had done anything correctly.

(Tr. 175)

19. In order to alleviate its quality concerns, the government decided to have asphalt core samples taken on the road (R4, tab 12 at 1). As the CO testified:

> The government first tried to have an outside Government agency do the core samples. But after about 30 days trying to get a Government agency to do the core samples, we finally asked the contractor to perform the core samples.

(Tr. 86) In his response to the government's request to postpone by one day the date when the core samples would be taken so that a government representative could be present, Mr. Rassin stated that such a postponement would not be possible because Lean had already paid the testing company. He stated further, that if the samples were not taken on 19 July 2013, Lean would lose its money. (R4, tab 15 at 1)

20. Although Mr. Rassin informed the COR that Lean had paid the testing company by 9 July 2013, the invoice forwarded by KA Construction Materials Testing Laboratory to Lean for $540 was dated 11 July 2013 (R4, tab 24). At the hearing, Mr. Rassin explained this discrepancy by testifying:

> Well, it doesn't have to be physically paid, but just agree[d] in the phone...just making the deal, that's important.

(Tr. 69-70) Mr. Rassin also testified that he never had any contract with the testing laboratory and that he coordinated the core sampling with an intermediary, Atayee Construction and Transportation Service (tr. 70).

21. On 14 July 2013, Lean forwarded to the government the testing results of the asphalt core samples which indicated an average thickness of 14.2 centimeters (R4, tab 17). Lean subsequently provided the core samples to the government (tr. 177).

22. On 22 July 2013, the CO accepted the asphalt work performed by Lean, even though he had concluded, as a result of a site visit, that the quality of the work was poor (R4, tab 22; tr. 118).

23. On 27 July 2013, Lean asked the CO to process a request for equitable adjustment (REA) for an additional 900 cubic meters of aggregate sub-base which it had allegedly provided when it encountered "soft mud" while excavating the old road (R4, tab 21 at 2). The total purported extra cost was $21,600 (R4, tab 20 at 1).

24. On 22 August 2013, Lean provided the CO with an invoice from Horaakhsh Construction Services for additional aggregate. Contrary to the specific requirements of the contract, the invoice was written in Dari rather than English. (R4, tab 1 at 33, tab 28 at 4)

25. On 25 August 2013, Lean provided the CO with an English version of the Horaakhsh invoice. The reference number for the invoice was 1217, and the invoice included two telephone numbers. The invoice stated:

> This receipt is for provision and transportation of extra aggregate base for the road of costume [sic] department in Kabul Airport.
>
> **Quantity**: 900 m$^3$
>
> **Price per m$^3$**: 1,300 Afghani
>
> **Total Cost**: 1,170,000 Afghani
>
> **Customer**: Lean Construction and Engineering Company

(R4, tab 31 at 1, 5)

26. On 28 August 2013, the CO and Mr. Jalil, an Army business advisor, attempted to contact a representation of Horaakhsh telephonically to verify the invoice; however, the representative told them that he could not confirm the invoice after being given the reference number (tr. 92-93).

27. The CO also testified that, if additional aggregate had actually been provided, Lean should have been able to produce delivery tickets for it (tr. 98). But when the government requested the delivery tickets, Lean responded that "we don't have any delivery tickets" (R4, tab 42).

28. On 14 August 2013, Lean submitted a second REA relating to its costs for providing the asphalt core samples. Lean included an invoice from KA Construction for $540 even though it sought only $500 for the samples in its REA. (R4, tabs 22, 24)

29. On 28 August 2013, the CO forwarded an email to KA Construction, asking it to verify the legitimacy of the $540 invoice. KA Construction responded that day, stating:

> First of all thank you for your verification and confirmation. Please find the attachment of our original Invoice and test result KACMTL has done for Lean Construction Company. The invoice sent by you is not in our record. If you need our further confirmation it will be my pleasure to co-operate with you.

It attached an image of its own original invoice to its email in a total amount of $105. (R4, tab 33 at 1, 6; tr. 87-88)

30. Included in Lean's second REA was a request for so-called opportunity costs in a total amount of $28,386. Lean explained its request in these terms:

> We finished the project on 4 Jun 2013 and sent the photos for Mr. Nicholson (COR), but then I received email from Mr. Penwell saying the project is not acceptable and we (Lean Construction & Engineering Co) should wait for a core test and this will take 18 days, then it took 52 days (from 4 Jun 2013 that the project was ready for handover till 22 July 2013 that the pavement was accepted), but we know core test will take only few minute, so I don't see any justification for that time. Moreover after couple of weeks the USG could not take a core test and they asked us (Lean Construction & Engineering Co) to take a test which is not our job.
> While we were waiting for the test we mentioned to the contracting officer (Mr. Penwell) about the cost of waiting, but we received email from Mr. Penwell saying that we can claim for opportunity cost but the contracting officer may terminate this project. Now project is accepted, it is our turn to claim for opportunity cost. Our opportunity cost for the whole duration of project is 30% of total value of the project, hence (52days/90days)
> * 0.3 * 148,878* 1.1 exchange = **28.386 USD**

11

(R4, tab 22)  Other than explaining the 52-day figure, Lean did not provide any substantiation for the numbers which it included in the last sentence of the REA. At the hearing, Mr. Rassin testified that, if it was not paid for its work, Lean could not "move to other projects." But, he did not identify any other projects which represented lost opportunities. (Tr. 27)

31. Also in its second REA, Lean stated that it needed "a tax exceptional [sic] letter or 2% VAT for the whole project which is **3,555 USD**" (R4, tab 22).  On 16 December 2013, the contracting officer provided Lean with the tax exempt letter (R4, tab 39).

32. In a decision issued on 7 September 2013, Mr. Penwell, the CO, denied Lean's four items in the two REAs.  Regarding REA #1, Lean's claim for a differing site condition, the CO relied upon the fact that Lean never submitted a legitimate invoice for this work, as required by the contract.  (R4, tab 34 at 3-4)  As for Lean's REA for opportunity costs, the CO found:

> The contractor requested an equitable adjustment for $28,386.00 for opportunity costs from 04 June 2013 thru 22 July 2013.  At the time of submission, and after a request for additional information to substantiate the opportunity cost, no further information was received [from] the contractor.  The COR reports show that the contractor was complete or nearly complete with all aspects of the contract at the time the contractor requested final payment on 09 June 2013.  The COR did not approve or accept the work on 09 June 2013 and the COR requested additional testing to ensure the customer performed the contract within the terms.  On 08 June 2013, a Suspension of Work was issued to the contractor.  On 09 June 2013, the contractor acknowledged the Notice.  The only opportunity cost would be for the equipment and labor on hand.  During the Suspension of Work, the Contractor had no equipment or laborers on site.  The Contractor was required to remove all the equipment from the site after the completion of the asphalt road.  Therefore, the opportunity cost of $28,386.00 request is denied.

(*Id.* at 4)  With respect to the core samples, the CO found that a verifiable invoice in the amount of $500 did not exist.  Finally, regarding the tax exempt letter, the CO indicated that such a letter was forthcoming.  (*Id.*)

33. On 14 September 2013, Lean filed a claim for the "first three items," but dropped its claim for a tax exempt letter, based upon the CO's assurances (R4, tabs 35, 36 at 1).

34. On 16 November 2013, the CO issued a final decision denying Lean's claim. With respect to the "soft mud" claim, the CO found that Lean did not give proper notice to the government of a differing site condition. Regarding the remaining items, the CO denied them with the same rationale used in the earlier decision. (R4, tab 37 at 3-4)

35. This timely appeal followed.

<u>DECISION</u>

*Differing Site Condition*

Regarding Lean's claim for a differing site condition filed pursuant to FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984), Lean did not give timely notice to the CO of either (1) "subsurface or latent physical conditions at the site which differ materially from those indicated in the contract," or (2) "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract" (R4, tab 1 at 32; findings 12, 15). The clause requires that such notice be given promptly and before the conditions are disturbed. Based upon the record, this clearly did not occur (findings 11-15). *See, e.g., MGM Contracting Company,* ASBCA No. 27839, 85-3 BCA ¶ 18,359 at 92,115. This lack of notice prejudiced the government because it was prevented from undertaking its own site investigation before the condition was disturbed (finding 15). *David Boland, Inc.,* ASBCA Nos. 48715, 48716, 97-2 BCA ¶ 29,166 at 145,025. Moreover, Lean never proved it had actually incurred the additional costs which it claimed (findings 24-27). *See, e.g., Downing Electric, Inc.,* ASBCA No. 42565, 91-3 BCA ¶ 24,228 at 121,180.

But, more to the point and based upon the evidentiary record, Lean has failed to demonstrate that it actually encountered a differing site condition. At the hearing, Mr. Rassin relied upon a series of photographs to prove its site condition claim. But Mr. Moody, the government's quality assurance specialist with 30 years of experience in the construction industry, examined the same photographs and reached the opposite conclusion. He concluded that the cross-sections of the excavation revealed clay, not wet soil. Mr. Moody also testified that he did not "see anything" that "was additionally soft or wet or somehow contaminated or unsuitable with organics such that a road could not be built on it." (Finding 17) Based upon Mr. Moody's detailed

13

and credible testimony, we conclude that Lean did not encounter a differing site condition at the job site. Accordingly, its appeal in this regard is denied.

*Opportunity Costs*

Lean bases this claim upon the government's purported delay in processing final payment as a result of its concern about the quality of Lean's work (finding 30). However, on the date when the CO issued its suspension of work, Lean had already completed the paving job and had removed its equipment and laborers from the job site (finding 32). Moreover, at the hearing, Mr. Rassin could not identify any other projects which represented lost opportunities during this time period. Finally, Lean provided no substantiation for the numbers which it included in its claim, other than the 52-day suspension figure (finding 30). On these bases, the appeal in this regard is denied.

*Core Samples*

The government asked Lean to perform core samples to test the quality of the asphalt pavement. It is undisputed that this was extra contractual work. (Finding 19) In its REA of 14 August 2013, Lean attached an invoice for $540 for this work. The CO was unable to verify this invoice. However, the subcontractor did forward an invoice in a total amount of $105 to the CO which we find to be credible. (Findings 28-29) On this basis, we find that Lean is entitled to recover $105, plus CDA interest from 14 September 2013 until date of payment.

*Tax Exempt Letter*

The CO provided such a letter to Lean (finding 31). Accordingly, the appeal in this regard is denied as moot.

## CONCLUSION

The appeal is sustained in the amount of $105, plus CDA interest from 14 September 2013 until payment, and is denied in all other respects.

Dated: 6 November 2015

*Michael T. Paul*

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

14

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 58995, Appeal of Lean
Construction and Engineering Co., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15